IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:21-CT-03002-M

| | | |
|---|---|---|
| CASEY RAFAEL TYLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| JOHN SAPPER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

This cause is before the court on defendants' pending motion for summary judgment. Mot.
[D.E. 41]. For the reasons discussed below, the court grants the motion.

Relevant Procedural History:

On January 4, 2021, Casey Rafael Tyler ("plaintiff"), a state inmate proceeding *pro se*,
filed an unverified complaint under 42 U.S.C. § 1983 naming as defendants Bertie C.I. Warden
John Sapper ("Sapper") and Food Service Manager Ms. Leary ("Leary"), generally alleging
violations of his First, Eighth, and Fourteenth Amendment rights from 2009 until the present, and
specifically alleging he was denied breakfast meat at Bertie C.I., causing weight loss and hunger,
and, because he is in segregation, he "cannot obtain dental floss, nail clippers[,] or other hygiene
items." Compl. [D.E. 1] at 3, 5–7. For relief, plaintiff seeks, *inter alia*, money damages. Id. at 8.

On July 15, 2021, plaintiff moved to amend via an unverified amended complaint that
names as defendants Sapper, Leary, Director of Prisons Todd Ishee ("Ishee") and Unit Manager
Eldridge Walker ("Walker"), and specifically alleges that when held in "control status," he does
not receive sufficient food or needed hygiene products, to include "dental tools." Mot. [D.E. 8] at
¶¶3–39. For relief, plaintiff seeks, *inter alia*, money damages. Id. at ¶¶ 40–45.

On February 1, 2022, the court granted plaintiff's motion to amend, revoked the court's prior order allowing plaintiff to proceed without prepayment of fees, and directed plaintiff to pay the full filing fee by February 22, 2022. See Order [D.E. 12]. Plaintiff timely paid the filing fee.

On February 28, 2022, the court conducted its initial review, dismissed as untimely plaintiff's conditions-of-confinement claims arising more than three years before he filed the action, allowed to proceed in part plaintiff's Eighth Amendment claims against Leary as to insufficient food leading to undue hunger and weight loss of at least ten pounds while in segregated custody at Bertie C.I., and against Walker as to plaintiff's inability to access adequate "dental tools," including floss, while in segregated custody at Bertie C.I., dismissed plaintiff's First and Fourteenth Amendment claims, and dismissed without prejudice Sapper and Ishee as defendants. See Order [D.E. 14].

On June 6, 2022, plaintiff moved for reconsideration of initial review. Mot. [D.E. 19].

On June 26, 2022, Leary and Walker answered the complaint. See [D.E. 20, 21, 22].

On August 8, 2022, plaintiff filed a verified "supplemental complaint," together with the declaration of fellow inmate Antonio D. Smith, addressing claims that arose at Granville C.I. beginning in July 2022. See [D.E. 23].

On September 8, 2022, the court granted plaintiff's June 6, 2022, motion to the extent he further amended the complaint, allowed to proceed his claim that Ishee is personally responsible for the rule "concerning dental tools" in maximum-security high control ("HCON"), but denied that part of the June 6, 2022, motion seeking reconsideration of the court's dismissal of other aspects of his complaint, denied without prejudice that part of the June 6, 2022, motion seeking injunctive relief, and denied without prejudice the August 8, 2022, "supplemental complaint" to allow plaintiff to raise these new, unrelated claims in a separate action. See Order [D.E. 24].

2

On January 3, 2023, Ishee answered the complaint, Answer [D.E. 28], and the court entered a scheduling order, Order [D.E. 30].

On March 2, 2023, plaintiff moved to compel discovery. Mot. [D.E. 31]. Leary, Walker, and Ishee (collectively, "defendants") opposed the motion. [D.E. 32].

On April 27, 2023, the court denied plaintiff's motion to compel discovery and his request for sanctions, re-opened the discovery period, and amended the scheduling order. Order [D.E. 33].

On both June 12 and July 18, 2023, the court granted motions seeking extensions of the discovery and motions deadlines. Order [D.E. 36]; Order [D.E. 38].

On August 29, 2023, plaintiff again moved to compel discovery. Mot. [D.E. 39]. Defendants opposed the motion. [D.E. 40].

On September 25, 2023, defendants filed a motion for summary judgment, Mot. [D.E. 41], a memorandum [D.E. 42], a statement of facts [D.E. 43], an appendix [D.E. 44], proposed sealed documents [D.E. 45], and a motion to seal, Mot. [D.E. 46]. The court notified plaintiff about this motion for summary judgment, the response deadline, and the consequences of failing to respond. [D.E. 47] (citing Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam)).

On October 16, 2023, plaintiff moved for an extension of time to respond. Mot. [D.E. 48].

On October 19, 2023, the court denied plaintiff's motion to compel, granted defendants' motion to seal, and granted in part plaintiff's motion for an extension of time, allowing plaintiff until November 13, 2023, to file his response to defendants' motion for summary judgment, allowing defendants until November 28, 2023, to file any reply, and warning the parties that the court would not grant any further extensions absent extraordinary circumstances. Order [D.E. 50].

On November 27, 2023, the court received plaintiff's response in opposition to defendants' motion for summary judgment, including a memorandum in support and an appendix. [D.E. 51].

Statement of Facts:

The facts are disputed were noted. From July 1, 2020, to February 3, 2021, plaintiff was confined at Bertie C.I. and held in Restrictive Housing for Control Purposes ("RHCP"). Defs.' Stmt. Mat. Facts. [D.E. 43] at ¶¶8–9. The parties agree that Leary: "has worked in correctional food services for North Carolina Prisons since 1996"; serves as Correctional Food Services Manager III at Bertie C.I.; and, at all relevant times, "was responsible for managing every aspect of Bertie C.I. food Management operations, including the supervision of staff, procurement of goods, management of inventory, as well as ensuring sanitation and food safety standards are met." Id. at ¶¶30–32. The parties also agree that, during his time at Bertie C.I., plaintiff "received satellite segregation meals, religious accommodations, and behavior modification diets." Id. at ¶37. The parties, however, disagree whether Leary served plaintiff insufficient food. Compare id. at ¶38 ("Leary states she never served plaintiff less food than his identified diet allowed"), with Pl.'s Opposing Stmt. Mat. Facts. [D.E. 51] at 2 (stating defendants' paragraph 38 is "denied as untrue & unsupported by any admissible evidence in the record").

Plaintiff also disputes defendants' statements that, pursuant to an incident on July 24, 2023, he "was charged with an A-9 offense, assaulting staff with liquids, and provided a disciplinary hearing with notice and an appeal," and that "[e]vidence was sufficient to find Plaintiff guilty, which included Plaintiff's own admission, and sanctions were imposed." Compare Defs.' Stmt. Mat. Facts. [D.E. 43] at ¶¶47–48, with Pl.'s Opposing Stmt. Mat. Facts. [D.E. 51] at 1–2 (stating defendants' paragraphs 47 and 48 "are denied as immaterial to the questions before this court," and paragraph 48 is "denied as untrue & unsupported by any admissible evidence in the record"). The record, however, supports defendants' statements. See Defs.' App., Ex. C [D.E. 44-4] at 1–7, id., Ex. D [D.E. 44-5] at 1–40.

4

Plaintiff further disputes defendants' statements that: "prisons use a behavior modification diet to modify assaultive behavior and maintain security"; "Behavior modification meals serve the penological interest of preventing the severe security risk of Offenders throwing bodily fluids and feces on staff and other offenders"; "The special management meal is a nutritionally balanced loaf-style form of nourishment that may be utilized, in conjunction with other behavior modification tools, to address inmates on restrictive housing status . . . that display disruptive behavior"; "This procedure is not intended as punishment, but rather as a behavior modification tool designed to maintain order and a clean, sanitary environment"; "When an offender is assigned to a Special Management diet, medical personnel assess the offender to assess whether there is any medical reason the Special management diet would not be appropriate"; "The Special Management diet is implemented as soon as possible after the disruptive behavior in order to achieve the greatest level of behavior modification"; and "Special Management meals are limited to a seven-day duration." Compare Defs.' Stmt. Mat. Facts. [D.E. 43] at ¶¶49–54, 56, with Pl.'s Opposing Stmt. Mat. Facts. [D.E. 51] at 1–2 (stating defendants' paragraphs 49, 50, 52, 53, 54, and 56 "are denied as immaterial to the questions before this court," and that paragraphs 50, 51, 52, 53, 54, and 56 are "denied as untrue & unsupported by any admissible evidence in the record").

The parties agree that, while on the Special Management diet: "[a]ll food or items that may be used as containers will be removed from the cell"; "Inmates are not allowed to purchase food or beverages from the canteen"; "this is the only food [inmates] are allowed unless medical staff have authorized something additional based on their dietary needs"; and, "if disruptive behavior is not curbed," the Special Management meals may be extended for an additional seven days, "but the offender will be allowed one regular meal before restarting and the offender will receive another medical assessment." Defs.' Stmt. Mat. Facts. [D.E. 43] at ¶¶55, 57.

5

Plaintiff disputes defendants' statements that he began a "nutraloaf behavior modification diet on July 26, 2020," that "he was assessed for the behavior modification nutraloaf diet and deemed medically fit for the assignment," and that, "at the beginning of the behavior modification nutraloaf diet [he] had a recorded weight of 166.4 pounds." Compare Defs.' Stmt. Mat. Facts. [D.E. 43] at ¶¶60–63, with Pl.'s Opposing Stmt. Mat. Facts. [D.E. 51] 2 (stating defendants' paragraphs 60–63 are "denied as untrue & unsupported by any admissible evidence in the record"). The record, however, supports defendants' statements. See Defs.' App., Ex. F [D.E. 45-1] at 2 (July 26, 2020, clinical encounter noting "nutraloaf initiated 7/26/20"), id., Ex. G [D.E. 45-2] at 1-2 (July 26, 2020, clinical encounter stating, "Nutraloaf assessment. No medical reason to prohibit the management meal," and noting plaintiff's current weight at 166.4 pounds).

The parties agree that, on August 20, 2020, plaintiff was provided a nutritional assessment and was weighed at 168.8 pounds, indicating an 11-pound weight loss from January 2020 through July 2020. Defs.' Stmt. Mat. Facts. [D.E. 43] at ¶¶64, 66–67. Plaintiff, however, disputes defendants' statements that, at this August 20, 2020, nutritional assessment, plaintiff was noted to be in a "healthy range with no significant weight loss," and "plaintiff noted no other complaints, was not in distress, and ambulated without issue." Compare id. at ¶¶65, 68, with Pl.'s Opposing Stmt. Mat. Facts. [D.E. 51] at 2 (stating defendants' paragraphs 65 and 68 are "denied as untrue & unsupported by any admissible evidence in the record"). The record, however, supports defendants' statements. See Defs.' App., Ex. H [D.E. 45-3] at 1–4 (Aug. 20, 2020, clinical encounter); id., Ex. I [D.E. 45-4] (Aug. 20, 2020, nutritional assessment form).

On October 28, 2020, plaintiff had a diet consultation sick-call encounter where he reported, "I want to change my diet because I've lost weight." Defs.' Stmt. Mat. Facts. [D.E. 43] at ¶¶71–72; accord Defs.' App., Ex. K [D.E. 45-6].

6

On October 30, 2020, plaintiff was provided another nutritional assessment noting his current weight as 166.8 pounds, that plaintiff then was "on the standard non pork diet and wanted to be on the MNT4 diet," and that his weight was "stable over the past three months and the weight fluctuations were not significant." Defs.' Stmt. Mat. Facts. [D.E. 43] at ¶¶69–70, 73–74; accord Defs.' App., Ex. J [D.E. 45-5].

Plaintiff disputes defendants' statements that a November 6, 2020, "review note within the medical record indicates Plaintiff 'wants a different diet, claims weight loss, but this is contradicted by stable weight x 3 years in flow chart, has normal BMI," and "On December 4, 2020, "plaintiff had a dietitian note requesting a weight check." Compare Defs.' Stmt. Mat. Facts. [D.E. 43] at ¶75, with Pl.'s Opposing Stmt. Mat. Facts. [D.E. 51] at 2 (stating defendants' paragraph 75 is "denied as untrue & unsupported by any admissible evidence in the record"). The record, however, supports defendants' statement. See Defs.' App., Ex. K [D.E. 45-6] at 3 (Nov. 6, 2020, clinical encounter administrative note); id., Ex. J [D.E. 45-5] (Dec. 3, 2020, nutritional assessment).

As to his "dental tools" claim, the parties agree that: Walker works at Granville C.I. where he is an HCON unit housing manager; Walker has never worked at Bertie C.I.; Bertie C.I. is not an HCON facility; and offenders on HCON and RHCP units have limited canteen access and are not allowed long-handled toothbrushes or dental floss. Defs.' Stmt. Mat. Facts. [D.E. 43] at ¶¶83, 85, 92–95. The parties, however, dispute whether Walker denied plaintiff dental tools, had an intent to cause plaintiff harm, and did cause plaintiff harm. Compare id. at ¶¶97–98, with Pl.'s Opposing Stmt. Mat. Facts. [D.E. 51] at 2 (stating defendants' paragraphs 97 and 98 are "denied as untrue & unsupported by any admissible evidence in the record").

Although he does not contest that long-handled toothbrushes, dental floss, or cut Plexiglas could be used as weapons, Defs.' Stmt. Mat. Facts. [D.E. 43] at ¶¶87, 89, plaintiff disputes whether

7

long-handled toothbrushes or dental floss are denied for safety or security reasons because they could be used to cut plexiglass, pass contraband, facilitate escape attempts, or "impair the security of the facility and put staff, other offenders, and the general public at risk." Compare id. at ¶¶86, 88, 90–91, with Pl.'s Opposing Stmt. Mat. Facts. [D.E. 51] at 2 (stating defendants' paragraphs 86, 88, 90, and 91 are "denied as untrue & unsupported by any admissible evidence in the record").

Notably, plaintiff does not dispute defendants' statements that: at times relevant to the complaint, Ishee was the Commissioner of Prisons and now serves as the Secretary of the North Carolina Department of Adult Correction ("DAC"); as Commissioner, Ishee's duties were to oversee the Division of Prisons; and Ishee "is not familiar with individual defendants or the day-to-day operations of each facility." See Defs.' Stmt. Mat. Facts. [D.E. 43] at ¶¶99–101, 103.

Arguments:

Defendants argue they are entitled to summary judgment on plaintiff's surviving claims because: the meals Leary served at Bertie C.I. were standardized, nutritionally adequate meals that accorded to plaintiff's diet classification; the record shows plaintiff received regular medical and dietary assessments and his weight loss was not "significant"; plaintiff was provided adequate dental tools; denying inmates dental floss and long-handled toothbrushes due to security risks is reasonably related to legitimate penological interests; Walker and Ishee neither knew of, nor failed to promptly respond to, plaintiff's dental needs at Bertie C.I.; and defendants are entitled to both qualified immunity for individual capacity claims and Eleventh Amendment immunity for official capacity claims. See Defs.' Mem. [D.E. 42].

In response, as to his "undue hunger & weight loss claim" plaintiff argues, *inter alia*: from January to July 1, 2020, he was on an HCON unit at Polk C.I. (later renamed Granville C.I.) where his weight was recorded between 180.2 lbs. and 170.6 lbs.; on July 1, 2020, he was placed in

8

RHCP at Bertie C.I. and his weight was recorded at 173.8 lbs.; Bertie C.I. medical staff recorded his weight 5 additional times in 2020 with his lowest weight at 164.8 lbs. and his highest at 170.2 lbs.; in January 2021, his weight was recorded at 167 lbs.; while at Bertie C.I. he submitted at least five sick calls concerning food or nutrition where he complained about hunger and weight loss; all nutritional assessments suggest his ideal weight is 178 lbs., but for 7 months at Bertie C.I., he weighed less than 170 lbs.; being consistently ten pounds below his ideal weight "under Leary's feeding regimen," coupled with his emotional distress, shows that Leary knowingly underfed him for at least 6 months; when he returned to HCON in 2021, medical staff ordered monthly weight checks and increased his calories, leading to weight gain to at least 180 lbs.; the food policies do not "command or recommend no breakfast meat for solitary confinement prisoners"; neither housing nor limited activity are a legitimate penological interest for food reduction; and Leary "failed to put forward a valid penological interest in serving any less food at all to solitary confinement prisoners." Pl.'s Mem. [D.E. 51-1] at 1–6. As to his "dental tool" claim, plaintiff argues, *inter alia*, the cases upon which defendant seek to rely do not properly apply the test announced in Turner v. Safley, 482 U.S. 78 (1987) ("Turner"). Id. at 6–7. Plaintiff generally contends that the restriction on dental tools does not satisfy the Turner test. Id. at 8–14. Finally, plaintiff contends that defendants' arguments in support of their motion for summary judgment do not address his claims regarding his "beef with the State toothpaste [sic]." Id. at 14.

Legal Standard:

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a

9

genuine issue of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A court reviewing a motion for summary judgment should determine if a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

Discussion:

As an initial matter, and as noted above, the complaint and amended complaint are unverified. Cf. Goodman v. Diggs, 986 F.3d 493, 498 (4th Cir. 2021). Plaintiff also has not offered affidavits or declarations in opposition to defendants' motion for summary judgment despite receiving adequate notice pursuant to Roseboro and having an opportunity to do so. See Celotex, 477 U.S. at 324; cf. Pledger v. Lynch, 5 F.4th 511, 525–27 (4th Cir. 2021).

Next, plaintiff's claims against defendants in their official capacities are barred by the Eleventh Amendment unless the state has waived immunity. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 66, 71 (1989). Because North Carolina has not waived immunity, defendants are entitled to summary judgment on any official capacity claims. See Anderson, 477 U.S. at 249.

The court now turns to plaintiff's surviving Eighth Amendment claims. "In order to make out a *prima facie* case that prison conditions violate the Eighth Amendment, a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993)

10

(quotation omitted). The first prong requires that "the deprivation of [a] basic human need was objectively sufficiently serious." Id. (quotation and emphasis omitted). The second prong requires a showing that "the officials acted with a sufficiently culpable state of mind." Id. (quotation and emphasis omitted); see Farmer v. Brennan, 511 U.S. 825, 835 (1994) ("[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.").

"Deliberate indifference" to a prisoner's "serious medical needs" violates the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976); see also Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). "In order to establish a claim of deliberate indifference to a medical need, the need must be both apparent and serious, and the denial must be both deliberate and without legitimate penological objective." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999).

A prison official, however, is not liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837; see Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) (finding defendant must have "actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by [the defendant's] action or inaction."); Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995) (requiring prison official knew of and disregarded an "objectively serious condition, medical need, or risk of harm"). Beyond actual knowledge, the official "must also have recognized that his actions were insufficient to mitigate the risk of harm to the inmate." Iko, 535 F.3d at 241 (quotation marks and citation omitted); see Grayson, 195 F.3d at 695 ("Deliberate indifference is a very high standard–a showing of mere negligence will not meet it.").

11

Pursuant to his "undue hunger & weight loss" claims against Leary, plaintiff specifically alleges that: previously at Polk C.I., he had "maintained 175 pounds & never dipped below 170"; while in segregation at Bertie C.I., he "lost ten pounds or more & cannot get above 165"; at Bertie C.I., Leary fed him "less food than [he] ever suffered from any other prison [sic]"; he was not receiving breakfast meat; he was hungry every night; he requested a higher calorie diet in sick calls but "cannot get on a better diet"; due to the amount of food he is served or allowed to buy in segregation or as a Control Status inmate, he has "never been able to work out regularly sans being unduly fatigued or at an undue level of hunger [sic]"; his "weight has consistently been lower in [segregation] than in regular population & [he] is not able to realize [his] full physical potential [sic] under these conditions which [causes him] emotional distress as well"; and that, in response to a grievance, Leary admitted that segregation inmates receive less food than regular population inmates.  See Compl. [D.E. 1] at 5; Am. Compl. [D.E. 8] at ¶¶25–26, 30.

Leary declares, *inter alia*: the DAC, then known as the Department of Public Safety ("DPS"), has departmentwide policies on food management that are kept and maintained in the Food Nutrition Management Manual; "The mission of Food Management is to 'ensure the operation of the Food and Nutrition Management Section within the Department of Adult Corrections/ Prisons is standardized and managed efficiently, [and] provides nutritionally adequate meals and meets governmental health and safety standards'"; prison menus are written by licensed and qualified Registered Dietitians; the "cycle menu" includes "regular, therapeutic, and religious meal patterns designed to meet the nutritional needs of the inmate population"; all menus are analyzed for nutritional adequacy using the Food Management System ("FMS"), a web-based automated food service system created by the Department of Public Safety Management Information Systems section in consultation with the Food and Nutrition Management

12

Department"; "the use of FMS by all facilities promotes consistent, standard meal service" for the prisons; "nutritional adequacy determination is based on Dietary Reference Intakes as determined by the Food and Nutrition Board of the National Research Council"; every meal has a non-meat entrée option; prisons also offer therapeutic diets that modify the regular menu to cover additional nutritional requirements, including higher caloric needs; therapeutic diets are served to inmates "only upon the written order of a treating provider (physician, dentist, or physician extender)"; prisons offer religious menus written by licensed, Registered Dietitians; "Nutritional need determinations are based on the Dietary Reference Intakes ("DRI") established by the Food and Nutrition Board of the National Academy of Science; all menus are analyzed for nutritional adequacy and meet or exceed the DRI for the intended target population; prisons have separate policies for feeding offenders in segregated housing entitled satellite/segregation feeding; "the satellite menu is a temperature consistent modification of the regular menu"; therapeutic diets, other menu accommodations, and nutritional requirements are maintained on satellite menus; Nutraloaf diets, by contrast, are behavior modification meals upon which offenders are placed only if medically approved; Leary uses the FMS per policy; during plaintiff's time at Bertie C.I., he received satellite segregation meals, religious accommodations, and behavior modification diets; and Leary never served plaintiff less food than his identified diet allowed. See Defs.' App., Ex. 3, Leary Decl. [D.E. 44-18] at 1–5.

The record reflects that, while at Bertie C.I., plaintiff lost weight, was measured below his ideal weight, and complained about hunger and his dietary needs. Nevertheless, the record also reflects that, while at Bertie C.I., he was regularly assessed by medical staff and dietitians, all of whom found that his weight loss was not medically significant, his BMI was normal, and he did not require a change of diet. See Defs.' App., Ex. H [D.E. 45-3] at 1–4 (Aug. 20, 2020, clinical

13

encounter noting a subjective complaint of "I need more calories, I'm losing weight," recording current weight as 168.8 lbs., assessing "no significant findings," entering a request for a dietician consultation, and recording, *inter alia*, "offender requesting diet change," "offender denies any pain . . . and any other concerns" and "no distress noted as offender ambulates out of medical"); id., Ex. I [D.E. 45-4] (Aug. 20, 2020, nutritional assessment noting: current weight of 169 lbs.; plaintiff's weight history of 153 lbs. in January 2011, 180 lbs. in Jan. 2020, 174 lbs. in July 2020, 170 lbs. in July 2020, and 166 lbs. in July 2020; finding his 11 lbs. weight loss amounts to 6% over 7 months from January 2020 to August 2020 and was "not significant"; measuring him at 94% of his ideal body weight, with a healthy BMI of 22.9; finding "no significant WT changes noted," "no indication for MNT diet or added KCAL at this time," and "recommended continue a regular (non-pork through food service) diet which exceeds [estimated] KCAL/Protein needs & provides religious menu accommodations"); id., Ex. J [D.E. 45-5] (Oct. 30, 2020, nutritional assessment noting a current weight as 166.8 pounds, that he was "on the standard non pork diet and wanted to be on the MNT4 diet," and his weight was "stable over the past three months and the weight fluctuations were not significant"); id., Ex. K [D.E. 45-6] at 3 (Nov. 6, 2020, clinical encounter administrative note by Charlotte Evans, MD, stating plaintiff "wants different diet, claims weight loss, but this is contradicted by stable weight x 3 years in flow chart, has normal BMI"); id., Ex. L [D.E. 45-7] (Dec. 3, 2020, nutritional assessment: noting plaintiff is at 93% of his ideal body weight and had healthy BMI of 22.6; finding "WT loss trend noted" but "no significant WT changes"; finding "no clinical indication for therapeutic diet"; and recommending "regular w/ snack diet non pork to meet nutrition needs"); id., Ex. M (Mar. 6, 2021, nutritional assessment at Polk C.I.: noting plaintiff's weight history of 153 lbs. in January 2011, 167 lbs. in Jan. 2021, 167 lbs. in Feb. 2021, and 168 lbs. in Mar. 2021; noting a current diet of Regular Non-

14

Pork; measuring him at 94% of his ideal body weight, with a healthy BMI of 22.7; noting he has maintained his weight since last assessment, recommending regular weight checks but stating the current diet "meets estimated energy needs and is therapeutic for diagnosis, but will be ineffective with canteen snacking"; recommending regular non-pork diet for two months with regular snack); Pl.'s App., Ex. 1 [D.E. 51-3] at 1 (medical record noting plaintiff's weight as: 176.8 lbs. on Dec. 10, 2019; 179 lbs. on Oct. 4, 2019; 174.8 lbs. on July 5, 2019; 170.6 lbs. on Apr. 11, 2019; and 174.0 lbs. on Jan. 31, 2019); id. at 3, Ex. 2A (medical record noting plaintiff's weight as: 166.8 lbs. on Oct. 30, 2020; 164.8 lbs. on Sept. 30, 2020; 168.8 lbs. on Aug. 20, 2020); id. at 5, Ex. 2B (medical record noting plaintiff's weight as: 166.4 lbs. on July 26, 2020; 170.2 lbs. on July 24, 2020; 173.8 lbs. on July 1, 2020; 170.6 lbs. on June 26, 2020; 173.1 lbs. on June 25, 2020; and 180.2 lbs. on Jan. 8, 2020); id. at 7, Ex. 3 (medical record noting plaintiff's weight as: 190.0 lbs. on Dec. 18, 2022; 185.0 lbs. on Nov. 3, 2022; 186.0 lbs. on Oct. 19, 2022; 188.0 lbs. on Sept. 19, 2022; 187.0 lbs. on Sept. 9, 2022; 188.0 lbs. on Aug. 20, 2022; 183.0 lbs. on July 21, 2022; 185.0 lbs. on June 21, 2022; 183.4 lbs. on May 22, 2022; 181.9 lbs. on Apr. 22, 2022; and 181.4 lbs. on Mar. 23, 2022); id., at 9, Ex. 4 (Jan. 2, 2021, clinical encounter noting, *inter alia*, plaintiff's subjective complaint of weight loss and recording his weight as 167.4 lbs., and assessing "no significant findings/no apparent distress"); id. at 11, Ex. 5 (Jan. 26, 2021, clinical encounter admin. note recording plaintiff's weight as 167.0 lbs.); id. at 13, Ex. 6 (Feb. 3, 2021, clinical encounter recording plaintiff's weight as 167.0 lbs.); id. at 15, Ex. 7 (July 31, 2020, sick call request, stating: "Request food supplement for unexplained consistent weight loss"); id. at 17, Ex. 8 (Aug. 27, 2020, sick call request, stating: "NEED MORE FOOD! PLEASE! I'M HUNGRY EVERY NIGHT! Losing WGT!"); id. at 18 (Aug. 20, 2020, nutritional assessment form); id. at 19, Ex. 9 (Sept. 16, 2020, sick call request, stating: "Need Diet Changed"); id. at 20, Ex. 10 (Sept. 21, 2020,

15

sick call request, stating, *inter alia*: "Want to get vitamin levels checked to see if I need any other supplements"); id. at 21, Ex. 11 (Oct. 20, 2020, sick call request, stating: "Saw nurse Wolosuk about diet change on September 20th, 2020, Yet my diet has not improved & I remain hungry all the time & it is really starting to piss me off [sic]. I AM HUNGRY. RIGHT NOW. Need more food!"); id. at 23, Ex. 12 (July 2, 2020, clinical encounter administrative note stating: "Dietitian recommendation completed[,] and offender has been ordered a Regular non-pork diet through food services. Offender accepted diet recommendations."); id. at 25, Ex. 13 (July 26, 2020, clinical encounter noting: subjective complaint of "take me off Nutraloaf," administrative note stating, "Nutraloaf assessment. No medical reason to prohibit the management meal," and recording current weight at 166.4 lbs.); id. at 27–30, Ex. 14A–C (Aug. 20, 2020, clinical encounter with a subjective complaint, "I need more calories, I'm losing weight," a finding of weight loss, measuring plaintiff's weight as 168.8 lbs. and BMI of 22.9, an assessment of "no significant findings/no apparent distress," a request for a routine dietician consultation, a notation that plaintiff was requesting a diet change to "the diet MNT 4," that he "denies any pain, denies, headache, vision changes, and any other concerns, gait steady, no distress noted as offender ambulates out of medical and back to his cell," and he was counseled about his diet, informed of the beginning of the process, and "aware it could take few weeks to get into motion," and an accompanying Aug. 21, 2020, administrative note by Charlotte Evans, MD, recommending continued standard diet); id. at 31–34, Ex. 15A–D (Oct. 28, 2020, clinical encounter with a chief complaint seeking a diet consultation, a subjective complaint of "I want to change my diet because I've lost weight," a measurement of plaintiff's weight as 166.8 lbs., an assessment of "nutrition, imbalanced: less than Body requirements as evidenced by weight loss," a request for a routine dietician consultation for weight loss, a note, in "other," that: "Offender seen in sick call requesting a diet change as he

16

reports he has had significant weight loss-nutritional consult entered. Offender currently on regular/non-pork diet, and he wants a MNT4," and a note, in "patient education topics," that this note "will be reviewed by Provider and decision on course for further care will be made at that time," and an accompanying Nov. 6, 2020, administrative note by Charlotte Evans, MD, noting that plaintiff's weight loss claims are "contradicted by stable weight x3 years in flow chart, has normal BMI"); id. at 35–38, Ex. 16A–C (Sept. 20, 2020, clinical encounter with: a subjective complaint of, *inter alia*, "I need more food"; administrative note stating, *inter alia*, "no weight lost today noted [sic]," "offender aware diet has been denied but is requesting that his Regular Diet be changed to MNT4 due to weight lost per offender," and "diet put in per offender request"; a measurement of plaintiff's weight at 164.8 lbs.; an assessment of "no significant findings/no apparent distress"; a request for a dietitian consultation "for massive weight loss per offender [sic]"; and, in "patient education topics," a note stating, "tried to explain that the diet has been denied, offender asking to request it anyway, that he is starving [sic].").

Presuming, without deciding, that plaintiff's weight loss and hunger were objectively sufficiently serious, he nevertheless fails to show that Leary knew of, but disregarded, a substantial risk of serious harm, Farmer, 511 U.S. at 837, recognized her "actions were insufficient to mitigate the risk of harm," Iko, 535 F.3d at 241 (quotation marks and citation omitted), or acted with the requisite culpable state of mind, Strickler, 989 F.2d at 1379. As noted above, Leary declares, *inter alia*: she uses the FMS per policy; menus are written by qualified, Registered Dietitians; the meals served are nutritionally adequate and meet or exceed the Dietary Reference Intakes for the intended target population; every meal has a non-meat entrée option; and she never served plaintiff less food than his identified diet allowed. See Defs.' App., Ex. 3, Leary Decl. [D.E. 44-18] at ¶¶7, 10. Because Leary is not alleged to be a dietitian or medical provider, she generally is entitled to rely

17

on such provider expertise as to the adequacy of plaintiff's assigned diet. See Iko, 535 F.3d at 242 ("If a prisoner is under the care of medical experts . . . a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands." (quotation omitted)); see also Lewis v. Hoke Cnty., No. 1:17CV987, 2020 WL 5213929, at *7 (M.D.N.C. Sept. 1, 2020) ("[P]rison officials without medical training are responsible for seeing that prisoners are attended to by medical professionals. They are not responsible for determining the course of treatment or for overruling the opinions of those professionals." (citation and internal quotation marks omitted)), report and recommendation adopted, No. 1:17CV987, 2022 WL 292928 (M.D.N.C. Feb. 1, 2022), aff'd, No. 22-6171, 2022 WL 1641282 (4th Cir. May 24, 2022) (per curiam) (unpublished).

Plaintiff, by contrast, merely relies upon his unsworn response to defendants' motion for summary judgment and the allegations in his unverified complaint and unverified amended complaint, none of which are sufficient to defeat summary judgment. See Fed. R. Civ. P. 56(e); Wai Man Tom v. Hosp. Ventures LLC, 980 F.3d 1027, 1037 (4th Cir. 2020) ("conclusory allegations or denials, without more, are insufficient to preclude granting [a] summary judgment motion"); Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003) ("neither '[u]nsupported speculation,' nor evidence that is 'merely colorable' or 'not significantly probative,' will suffice to defeat a motion for summary judgment" (internal citations omitted)).

To the extent plaintiff argues Leary has failed to justify the penological interest of DAC policy providing less food for inmates in segregation than inmates in the general population, there is no support for any inference that Leary was personally responsible for this DAC policy, and plaintiff may not amend his complaint through argument in opposition to defendants' motion for summary judgment. See Barclay White Skanska, Inc. v. Battelle Mem'l Inst., 262 F. App'x 556, 563 (4th Cir. 2008) (unpublished).

18

After considering the record evidence and the reasonable inferences in the light most favorable to plaintiff, see Scott, 550 U.S. at 378, Leary has shown the absence of a genuine issue of material fact as to plaintiff's Eighth Amendment claims of "undue hunger & weight loss," see Celotex, 477 U.S. at 325, whereas plaintiff fails to "come forward with specific facts showing that there is a genuine issue for trial," Matsushita, 475 U.S. at 587 (emphasis and quotation omitted). Thus, Leary is entitled to summary judgment. See Anderson, 477 U.S. at 249.

As to his surviving "dental tools" claim, plaintiff alleges that: Walker was "responsible for all HCON unit policies & practices"; the short-handled toothbrush he is allowed when on an HCON unit and generic state-provided toothpaste, "actively [discourages him] from brushing [his] tongue & teeth regularly"; Bertie C.I. staff informed him he cannot obtain dental floss in segregation; Ishee made the rule "concerning dental tools"; and, due to lack of adequate "dental tools" and floss, he developed gum disease and cavities, and required "9 tooth extractions by prison dentists." Compl. [D.E. 1] at 7; Am. Compl. [D.E. 8] at ¶¶17–18, 24, 27, 31; Mot. [D.E. 19] at 1.

Walker declares, *inter alia*: he works as a Correctional Housing Unit Manager III of the HCON Unit at Granville C.I.; he has worked his entire career at Granville C.I. and never worked at Bertie C.I.; he never denied plaintiff the dental tools allowed per policy; for security reasons, HCON and RHCP unit offenders are allowed toothpaste and a short-handled toothbrush; offenders have been known to use long-handled toothbrushes as weapons; offenders also misuse dental floss either as a weapon itself, or as a method to pass contraband, start fires, or cut plexiglass "which can be used to create a sharp weapon or attempt an escape"; offenders on HCON and RHCP have limited canteen access and are not allowed floss under departmental policy; "whether to allow dental floss for general population inmates is a facility head decision and [Walker has] not see it offered in years due to its security concern"; and plaintiff "is just another offender to" Walker, he

19

never had an intent to cause plaintiff harm, and none of his actions caused plaintiff harm. See Defs.' App., Ex. 4, Walker Decl. [D.E. 44-26] at 1–2.

Bertie C.I. Associate Warden of Custody Victor Locklear ("Locklear") declares, *inter alia*: Bertie C.I. is a close custody facility; from July 1, 2020, to February 3, 2021, plaintiff was in close custody on RHCP at Bertie C.I.; "Offenders on [HCON], maximum/high security control, and RHCP have limited canteen access"; "floss is not one of the items they are allowed"; HCON and RHCP offenders are allowed toothpaste and a short-handled toothbrush, but they are not allowed dental floss or long-handled toothbrushes which can be used to make weapons that put staff, offenders, and the public at risk. See Defs.' App., Ex. 2, Locklear Decl. [D.E. 44-16] at 1–2.

In his verified responses to interrogatories, Ishee states: he is "not familiar with individual Offenders or individual facility staffing rosters"; DAC policies in question are constitutional and expected to be followed at the facility level; and "Control status offenders present a higher security risk and therefore greater control over the variety of items allowed in their possession is needed for the security of staff, offenders, and the general public." Defs.' App., Ex. 5, [D.E. 44-28] at 7– 10. As to the query, "under what circumstances would you lift the canteen restrictions currently exclusive to Control Status prisoners," Ishee responds: "I am not familiar with the circumstances. This would be decided at the facility level, and I am not familiar with the day-to-day decisions at a facility." Id. at 12. As to the query, "Why are Control Status prisoners not allowed to participate in the Union Supply Direct program which, with DPS permission, sells snacks, hygiene and shoes to all NC prisoners not on Control Status or Safekeeper status," Ishee responds: "There are various types of control status, and each has varying restrictions . . . Any restrictions are designed to maintain safety and security of the offenders, staff, and general public." Id.

20

The court first considers the DAC policy denying certain "dental tools" to HCON and RHCP inmates. Under the four Turner factors, the court inquires:

> First, is there a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it? Second, are there alternative means of exercising the right that remain open to prison inmates? Third, what impact will accommodation of the asserted constitutional right . . . have on guards and other inmates, and on the allocation of prison resources generally? And, fourth, are ready alternatives for furthering the governmental interest available?

Beard v. Banks, 548 U.S. 521, 529 (2006) (internal citations and quotations omitted).

When applying the Turner factors, "[t]he burden [ ] is not on the State to prove the validity of prison regulations but on the prisoner to disprove it," and the court gives substantial deference to prison officials, especially as to the third factor. Overton v. Bazzetta, 539 U.S. 126, 132 (2003).

As to the first Turner factor, plaintiff contends that there is insufficient rational relationship between the disallowance of "dental tools" and institutional safety because HCON and RHCP inmates may possess batteries that can be used to start fires. See Pl.'s Mem. [D.E. 51-1] at 9. Walker and Locklear, however, both declare that long-handled toothbrushes and dental floss can be used as weapons, to make weapons, or to pass contraband. See Defs.' App., Ex. 2, Locklear Decl. [D.E. 44-16] at ¶4; id., Ex. 4, Walker Decl. [D.E. 44-26] at ¶4. The court finds there is a rational connection between the legitimate government interest of prison security and the policy precluding HCON and RHCP inmates from possessing long-handled toothbrushes and dental floss. See Beard, 548 U.S. at 529; Bell v. Wolfish, 441 U.S. 520, 547 (1979) ("Prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed . . . to maintain institutional security.").

As to the second Turner factor, plaintiff notes he lost 9 teeth in his ten years assigned to control status, showing the allowed dental tools were insufficient for adequate dental care. Pl.'s

21

Mem. [D.E. 51-1] at 9–10. However, because Walker and Locklear declare that HCON and RHCP inmates are allowed toothpaste and a short-handled toothbrush, Defs.' App., Ex. 2, Locklear Decl. [D.E. 44-16] at ¶4; id., Ex. 4, Walker Decl. [D.E. 44-26] at ¶4, it is uncontroverted that such inmates have some alternative "dental tools" available for dental care. See Beard, 548 U.S. at 529.

As to the third Turner factor, plaintiff asserts that defendants' concerns about dental tools are "frivolous." Pl.'s Mem. [D.E. 51-1] at 10. Plaintiff queries, "what impact could the misuse of dental tools have" on prison resources because, due to the high incidents of prison fires, guards already should be on "constant vigilance." Id. at 11. Locklear, by contrast, declares that long-handled toothbrushes and dental floss can endanger staff, offenders, and the public when used as weapons, to pass contraband, or to create tools for escape. Defs.' App., Ex. 2, Locklear Decl. [D.E. 44-16] at ¶4. The court gives substantial deference to prison officials' determination that allowing HCON and RHCP unit offenders to possess long-handled toothbrushes and dental floss would burden prison resources by threatening security and safety. See Overton, 539 U.S. at 135.

As to the fourth Turner factor, plaintiff contends that defendants have not shown why alternatives cannot work for them and proposes that he be allowed to buy his own mouthwash and toothpaste and trusted not to misuse floss and long-handled toothbrushes. Pl.'s Mem. [D.E. 51-1] at 11–12. The court, however, does not discern any "obvious" or "easy" alternatives to the present ban on HCON and RHCP inmate possession of long-handled toothbrushes and dental floss "that fully accommodates" plaintiff's rights "at *de minimis* cost to valid penological interests." Turner, 482 U.S. at 90–91 (noting the Turner "test is not a least restrictive alternative test").

After examining this challenge to the "dental tools" policy under the Turner test, plaintiff fails to satisfy his burden of showing this policy is not reasonably related to legitimate penological objectives. See Overton, 539 U.S. at 132; Turner, 482 U.S. at 89; O'Lone v. Estate of Shabazz,

22

482 U.S. 342, 360–61 (1987) (noting institutional security is a valid penological goal); Desper v. Clarke, 1 F.4th 236, 244 (4th Cir. 2021) (noting pleadings must allege sufficient facts to show that the contested policy lacked a "rational relation to legitimate penological interests.").

The court now turns to plaintiff's surviving Eighth Amendment deliberate indifference claim premised on the denial of "dental tools" at Bertie C.I. The record reflects various dental treatments at Polk C.I. and Maury C.I. See Defs.' App., Ex. N [D.E. 45-9] (July 28, 2021, Polk C.I. dental health history screening); Pl.'s App., Ex. 37–53 [D.E. 51-7] at 1–29 (dental records at Polk C.I. and Maury C.I.). Walker and Ishee, as they are not alleged to be medical providers, were entitled to rely upon the opinion of the dental experts treating plaintiff. See Iko, 535 F.3d at 242; Lewis, No. 1:17CV987, 2020 WL 5213929, at *7 (M.D.N.C. Sept. 1, 2020). Plaintiff also fails to show that Walker and Ishee were personally responsible for the alleged denial of "dental tools" at Bertie C.I. because, as noted above, defendants state, declare, and/or verify, and plaintiff does not dispute, that Walker and Ishee were uninvolved with the day-to-day operation of Bertie C.I. See Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985) (requiring a § 1983 plaintiff to "affirmatively show[ ] that the official charged acted personally in the deprivation of the plaintiff's rights," but finding mere knowledge of such a deprivation does not suffice (internal quotation marks omitted)).

As also noted above, Walker avers that he never had an intent to cause plaintiff harm, see Defs.' App., Ex. 4, Walker Decl. [D.E. 44-26] at ¶6, whereas plaintiff's response to defendants' motion for summary judgment again merely reiterates the bare assertions of deliberate indifference due to the denial of "dental tools" in his unverified complaint and unverified amended complaint, but such unsupported claims cannot survive defendants' motion for summary judgment. See Anderson, 477 U.S. at 248–49; Wai Man Tom, 980 F.3d at 1037; Bouchat, 346 F.3d at 522.

23

To the extent plaintiff instead seeks to revive claims regarding the quality of state-provided toothpaste, see Pl.'s Mem. [D.E. 51-1] at 14, or premises his Eighth Amendment claims on Ishee's supervisory role as Commissioner of Prisons, the court previously dismissed these claims on initial review, see Order [D.E. 14] at 8, 11. To the extent plaintiff seeks to revive these dismissed claims, or instead newly alleges that Walker denied him "dental tools" at Polk C.I. or Granville C.I. at different times, he may not amend his complaint through argument in opposition to defendants' motion for summary judgment. See Barclay White Skanska, Inc., 262 F. App'x at 563.

Thus, even presuming that his lack of "dental tools" was objectively sufficiently serious, but see Green v. Denning, 465 F. App'x 804, 807 n.2 (10th Cir. 2012) (noting "a claim based on the denial of dental floss was one of the examples of frivolous prisoner suits cited in the legislative history of the Prisoner Litigation Reform Act" (citation omitted)), because plaintiff fails to demonstrate that Walker and Ishee knew of, but disregarded, a substantial risk of serious harm as to plaintiff's access to "dental tools" claim at Bertie C.I., Farmer, 511 U.S. at 837, recognized that their "actions were insufficient to mitigate the risk of harm," Iko, 535 F.3d at 241 (quotation marks and citation omitted), or acted with the requisite culpable state of mind, Strickler, 989 F.2d at 1379, plaintiff again fails to satisfy the subjective component of an Eighth Amendment claim.

After considering the evidence and the reasonable inferences drawn therefrom in the light most favorable to plaintiff, Scott, 550 U.S. at 378, the court finds defendants have met their burden of showing the absence of a genuine issue of material fact as to plaintiff's "dental tools" claim, Celotex, 477 U.S. at 325, whereas plaintiff fails to "come forward with specific facts showing that there is a genuine issue for trial," Matsushita, 475 U.S. at 587 (emphasis and quotation omitted). Accordingly, Walker and Ishee are entitled to summary judgment. See Anderson, 477 U.S. at 249.

24

Alternatively, because they are government officials, defendants are entitled to qualified immunity from civil damages so long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, defendants are entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

Here, because plaintiff has not demonstrated that defendants violated his constitutional rights, defendants likewise are entitled to a finding of qualified immunity.

Conclusion:

For the reasons discussed above, the court GRANTS defendants' motion for summary judgement [D.E. 41]. The clerk shall close the case.

SO ORDERED this ___12th___ day of December, 2023.

RICHARD E. MYERS II
Chief United States District Judge

Case 5:21-ct-03002-M   Document 53   Filed 12/12/23   Page 25 of 25